IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANK BARTELL, ET. AL.,** | : | |
| | : | CIVIL ACTION |
| Plaintiffs | : | |
| v. | : | |
| | : | NO. 19-6056 |
| **COMMUNITY COLLEGE OF PHILADELPHIA** | : | |
| | : | |
| Defendants | : | |

| | | |
|---|---|---|
| **CAROL STEIN, ET. AL.,** | : | |
| | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| v. | : | NO. 19-6057 |
| | : | |
| **COMMUNITY COLLEGE OF PHILADELPHIA** | : | |
| | : | |
| Defendants | : | |

| | | |
|---|---|---|
| **MARGARET STEPHENS, ET. AL.,** | : | |
| | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| v. | : | NO. 20-1659 |
| | : | |
| **COMMUNITY COLLEGE OF PHILADELPHIA** | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM OPINION**

**Goldberg, J.**                                                                                       **October 7, 2024**

This case involves allegations of employment discrimination brought against Defendant, Community College of Philadelphia ("the College"), which moves for the entry of summary

1

judgment on all the Plaintiffs' claims.[1]  Because the evidence, even when viewed in a light most favorable to Plaintiff's does not support any of the claims, the motion shall be granted and judgment entered in favor of the College.[2]

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Frank Bartell, Stan Gilbert, Arlene Caney, Margaret Stephens, Carol Stein, Michael Stern, and Dorothy Koteski are all former full-time faculty members at the Community College of Philadelphia and are all over forty years of age. (Defs.' Statement Undisputed Material Facts,[3] ¶ 4). Prior to 2019, the College offered a benefit known as the Pre-Retirement Workload Option ("PRWL"). Under PRWL, faculty members over age fifty-five with at least ten years of service or over sixty years of age with seven or more years of service could elect to decrease their workload and salary by one-half while still receiving full-time benefits and the "full-time faculty" designation for the remainder of their employment with the College. (Id., ¶¶6, 23). This benefit had resulted from collective bargaining negotiations between the College and the union representing its full-time faculty and was memorialized in Article VIII, Section "F" of the *Full-Time Faculty Collective Bargaining Agreement ("CBA") between the College and the Faculty & Staff Federation of Community College of Philadelphia, American Federation of Teachers, Local*

---

[1]  Specifically, the Plaintiffs seek relief under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et. seq., ("ADEA"), and the Pennsylvania Human Relations Act, 43 P.S.§ 951, et. seq., ("PHRA").

[2]  As noted in previous Memorandum Opinions addressing various motions to dismiss, these cases were consolidated for discovery purposes on May 20, 2020; they are now the subject of this consolidated motion for summary judgment.

[3]  Referred to hereafter as "Defs.' Statement," or where relevant, "Pls.' Statement." Unless otherwise noted, only those portions of Defendants' Statement of Undisputed Material Facts which are not contested by the Plaintiffs are referenced in the Factual and Procedural Background portion of this Memorandum, and the ECF citations are to the docket in Case No. 19-cv-6056.

*2026, AFL-CIO* ("Federation" or "Union") in effect between September 1, 2011 to August 31, 2016. (Def.'s Mot. Summ. J., Ex. "E"; Defs' Statement, ¶¶ 6, 14 – 22). In addition to the PRWL option, those faculty members who had reached the age of sixty-six and had twenty years of service also had the option of choosing a "step-down" in pre-retirement workload whereby their workload would be reduced by 25% over a four-year period at 100% salary in the first two years, 50% salary in year three followed by complete retirement in year four, with overload pay for any credits taught over 75%, 50% and 25% in years one through three. (Id.) Once either of those options were elected, the eligible employee could neither switch options nor revert to full-load status. (Id.) These benefit options were also in effect in the CBA between the Union and the College which predated the 2011-2016 agreement. (Defs.' Statement, ¶ 6). As it relates to the outcome of this case, it is worth emphasizing that selection of any of these options was left entirely to the discretion of all Plaintiffs.

Between 2013 and 2019, each of the Plaintiffs qualified for and elected to take the PRWL option.[4] (Defs.' Statement, ¶¶ 7 – 9, 11 – 13). It is undisputed that the PRWL was expensive for the College because those faculty members who took the option performed only half the work of regular full-time faculty but received the same benefits as full-time faculty members teaching a full course load. These benefits included medical, prescription, and dental for the faculty member and his or her spouse and dependents at no cost, as well as § 403(b) contributions at the full-time classification rate. (Id., ¶ 42).

Because the 2011-2016 CBA was set to expire on August 31, 2016, the College and Union began arms-length negotiations for a new full-time faculty CBA in early 2016. (Defs.' Statement,

---

[4] Except for Dorothy Koteski, who elected to take PRWL status in 2013, all of the other plaintiffs made their elections between 2015 and 2019. (Defs.' Statement, ¶ 10).

¶¶ 25-26). The negotiations were difficult, lasted over three years and ultimately required mediator assistance to facilitate a new agreement for a CBA in the Spring of 2019. (Id., ¶ 27). Throughout the negotiations, the College periodically sent memoranda updating members of the College community on the progress of the bargaining process, including notices informing the full-time faculty that the College had proposed to eliminate the PRWL benefit and explaining that it was costing the College an additional $1 million a year. (Id., ¶ 65). In the meantime, the terms and conditions of the 2011 agreement continued to govern the relationship between the parties. (Def.'s Mot. Summ. J., Ex. "E"; Ex. "F," 50). Finally, on April 3, 2019, the College and the Union reached agreement on a new CBA, which, among other things, eliminated the PRWL benefit. (Id., Ex. "HH"; Defs.' Statement, ¶¶ 60-61, 68).

Those faculty who had opted in, including Plaintiffs, were offered three choices, which were also collectively bargained between the College and the Union. These were: (1) retire effective August 31, 2019 with 25% of their full-time salary as severance; (2) return to full-time status until they elected to retire; or (3) stay on PRWL for one additional year. Those faculty members who had elected PRWL to be effective in the Fall of 2019 or later, were also given the option of revoking their elections and returning to full-time teaching or choosing the step-down option, which remained unchanged. (Id., ¶ 70). Further, under the CBA between the College and the Federation's part-time/Adjunct/Visiting Lecturer bargaining unit, full-time faculty also had the option of returning to the college as Adjunct faculty after they retired. (Id., ¶ 71). The affected PRWL faculty were given until May 15, 2019 to respond with their choice. (Id., ¶ 72).

Not surprisingly, the Plaintiffs and other PRWL faculty members were not happy with the elimination of the benefit or the available options and they complained to the Union's leadership. (Id. ¶ 73). Subsequently, on May 16, 2019, a Settlement Agreement was reached whereby more

4

generous options were made available. (Id., ¶ 75). Plaintiffs Gilbert, Koteski, Stein, and Stern, who were faculty working on the PRWL as of Fall 2017, were offered options to: (1) retire effective August 31, 2019 and receive 25% of their full-time salary equivalent as a one-time severance payment, (2) return to full-time faculty status and remain in that status until their date of retirement, or (3) remain on PRWL for one year and retire on or before August 31, 2020. (Id.). Plaintiffs Bartell, Caney, and Stephens (as faculty who began working on PRWL as of Spring 2018, Fall 2018, or Spring 2019) were permitted to choose: (1) to retire effective August 31, 2019 and receive 25% of their full-time salary equivalent as a one-time severance payment, (2) remain on the PRWL for a maximum of three years from their original PRWL start date and then retire, or (3) return to full-time faculty status and have the option to later work a final year on PRWL status during their last year of employment. (Id.). The Settlement Agreement provided that the affected faculty members must inform the College's Human Resources Department of their decisions by May 30, 2019 and any faculty member who failed to do so would be returned to full-time status at the 24 credit/30 contact hour per year level (if an Academic Year employee) or full-time hours (if a Calendar Year employee). (Id., ¶¶ 76-77). This 24/30 hour per year requirement was the same course load requirement which was applied to the Plaintiffs before they began participating in PRWL. (Id., ¶ 77).

All the Plaintiffs provided notice of their decisions to the College by the May 30, 2019 deadline. (Id., ¶ 78). Plaintiffs Stein and Stern chose to retire effective August 31, 2019 and receive 25% of their full-time salary equivalent as a one-time severance payment; Plaintiff Stern also chose to return to teaching at the College as a member of the Adjunct faculty. (Id., ¶ 79). Plaintiffs Gilbert and Koteski decided to remain on the PRWL for one more year and retire on August 31, 2020. (Id., ¶ 80). Plaintiffs Bartell and Caney elected to remain on the PRWL for two

5

additional years and retire on August 31, 2021, and Plaintiff Stephens chose to remain on the PRWL for two and a half more years, and retire on December 31, 2021. (Id., ¶¶ 81-82).

Believing that the College's elimination of the PRWL option was motivated by age discrimination and after exhausting their respective administrative remedies, the Plaintiffs filed the complaints commencing these lawsuits on December 20, 2019 and March 30, 2020. As noted, all of the Plaintiffs seek to recover damages under the federal Age Discrimination in Employment Act (ADEA) and the Pennsylvania state Human Relations Act (PHRA). Following extensive discovery, the College now moves for the entry of summary judgment on all of the Plaintiffs' claims.

## II. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense on which summary judgment is sought." Fed. R. Civ. P. 56(a). The motion shall be granted and judgment entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. "A genuine dispute exits 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Stone v. Troy Construction, LLC, 935 F.3d 141, 148, n. 6 (3d Cir. 2019) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A "judge's function" in evaluating a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. To ascertain whether a genuine issue of material fact exists, the Court must review the record as a whole. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000). "The issue of material fact required . . . to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting

its existence." Anderson, 477 U.S. at 248-249. "[R]ather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. at 249 (internal citation omitted). And, in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in that party's favor. Tolan v. Cotton, 572 U.S. 650, 651 (2016) (per curiam); Scott v. Harris, 550 U.S. 372, 378, (2007). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Stewart v. Rutgers, State Univ., 120 F.3d 426, 431 (3d Cir. 1997) (internal citation omitted).

### III. DISCUSSION

#### A. Applicable Case Law – ADEA

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Stouffer v. Union R.R. Co., Inc., 85 F.4th 139, 145 (3d Cir. 2023) (quoting 29 U.S.C. § 623(a)(1)). The PHRA similarly declares it to be "an unlawful discriminatory practice" for any employer to refuse to hire or employ, contract with, discharge from employment, or to "otherwise discriminate" against any individual or independent contractor "with respect to compensation, hire, tenure, terms, conditions or privileges of employment." 43 P.S. § 955(a).

Two types of employment discrimination claims can be brought under these acts – claims for disparate impact and deliberate discrimination/disparate treatment. Smith v. City of Jackson, 544 U.S. 228, 231-232 (2005); Embrico v. United States Steel Corp., 404 F. Supp. 2d 802, 817

(E.D. Pa. 2005).[5] Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) (internal quotation marks and citation omitted). "In a disparate impact claim under the ADEA, the plaintiff challenges a specific, facially neutral employment practice that operates to 'deprive the individual of employment opportunities or otherwise adversely affects his status as an employee.'" Embrico, 404 F. Supp. 2d at 817 (quoting Smith, 125 S. Ct. at 1542). "In such a claim, the plaintiff must show that the practice has an adverse impact on older workers that is not due to reasonable factors other than age." Id. Thus, to establish a prima facie case of age discrimination based on disparate impact, a plaintiff must first identify a specific, facially neutral policy, and then proffer statistical evidence that the policy caused a significant age-based disparity. Stouffer, 85 F.4th at 146; Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 69 (3d Cir. 2017). Proof of discriminatory motive is not required under a disparate impact theory. Hazen Paper, 507 U.S. at 609.

In contrast, in a disparate treatment case, liability depends on whether the protected trait (*i.e.*, age) actually motivated the employer's decision. Id. at 610. Stated otherwise, "[t]o prevail on an intentional age discrimination claim under either the ADEA or the analogous provision of the PHRA, a plaintiff must show that his or her age actually motivated or had a determinative

---

[5] *See* e.g., Niculcea v. Stone Ridge Town Ctr., 2022 U.S. App. LEXIS 33642 at *8 (3d Cir. Dec. 22, 2022) (per curiam, non-precedential) (holding "the PHRA is analyzed under the same standards as its federal counterparts"); Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir. 1998) ("There is no need to differentiate between . . . ADEA and PHRA claims because . . . the same analysis is used for both"); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) ("[W]hile Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions . . . its courts nevertheless generally interpret the PHRA in accord with its federal counterparts").

influence on the employer's adverse employment decision." Fasold v. Justice, 409 F.3d 178, 183-184 (3d Cir. 2005) (internal quotation marks and citations omitted). A plaintiff can meet this burden by either presenting direct evidence of discrimination or by presenting indirect evidence of discrimination that satisfies the three-step framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. at 184. Under McDonnell Douglas, the employee must first make out a prima facie case of discrimination, after which the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. Id. If the employer does so, the inference of discriminatory motive is dispelled, and the burden shifts back to the plaintiff employee to show by a preponderance of the evidence that the employer's articulated reasons are false or a pretext for intentional discrimination. Id. The elements of a prima facie case of age discrimination are (1) that the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment action; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of discriminatory motive. Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015).

### B. Undisputed Evidence of Record

Even viewed in the light most favorable to Plaintiffs, the record evidence in this case does not support Plaintiffs' claims that the College's elimination of the PRWL benefit was either motivated by its intention to discriminate against them because of their ages or that it caused a significant age-based disparate impact. Turning first to the disparate treatment claim, while it is undisputed that each of the Plaintiffs is over the age of 40 and each was clearly qualified for the

9

positions which they held for over twenty-five years,[6] the remaining prima facie elements have not been established. For one, the deposition testimony of all the witnesses is aligned: the PRWL benefit at issue in this matter had resulted from collective bargaining between the College and the Federation's bargaining unit to which all the Plaintiffs belonged. The benefit at issue was not a vested or guaranteed benefit – it had always been subject to the collective bargaining process, and the College had previously attempted to bargain it away during negotiations for CBAs predating the one reached in 2019. (Defs.' Ex. "F," 45-46, 51, 62-63, 66-67, 78-79, 83; Ex. "G," 65; Ex. "H," 117-118; Ex. "J," 65-67; Ex. "K," 54-56; Pls.' Resp. Mot. Sum. J., Ex. "4," 21, 48-57, 165; Ex. "5," 17-19; Ex. "6," 39-44, ECF No. 74). As the College's representatives and each of the Plaintiffs themselves also acknowledged, the College never required them to take PRWL status in the first place. Not all faculty who met the age and service requirements were on PRWL status, and Plaintiffs were given several options **to choose from** when the PRWL benefit was bargained away. Among these options was returning to working the same number of hours that they had been working before electing to take PRWL status. (Defs.' Ex. "F," 54-55, 98; Ex. "G," 88-90, 153-155; Ex. "H," 107-108,  225-226, 140-141, 225-226; Ex. "I," 68-70, 78-79, 93-94, 99-100; Ex. "J," 93, 117, 147-148; Ex. "L," 84-85). In fact, if the Plaintiffs failed to give the College notice of which option they were choosing by May 30, 2019, the College would have automatically returned them to full-time faculty status. (Defs.' Ex. "H," 143). These undisputed facts, reflect choices available to Plaintiffs – not a mandated discriminatory practice imposed by the college.

---

[6] Frank Bartell began working at the College in 1972, Carol Stein in 1973, Arlene Caney in 1974, Dorothy Koteski in 1975 and Stan Gilbert in 1977, whereas Michael Stern and Margaret Stephens were hired in 1993. (Defs.' Mot. Summ. J., Exs. "F," 15; "G," 21-22; "H," 23-26; "I," 13-14; "J," 3; "K," 22-24; and "L," 14, ECF No. 66).

To constitute an adverse employment action, there must be a showing that the employer brought about some disadvantageous change in an employment term or condition, *i.e.*, that the change treats the employee worse **because of** the protected trait. Muldrow v. City of St. Louis, 144 S. Ct. 967, 974 (2024) (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998) and Bostock v. Clayton County, 590 U.S. 644, 658 (2020) (emphasis added)). Although the Plaintiffs are understandably unhappy about no longer having the option of teaching just twelve instead of twenty-four credit hours per year, they are now being treated the same as, and not worse than, those faculty members who are old enough to be eligible but had not elected to take PRWL status and/or who did not meet the age and service criteria for electing that status. Accordingly, Plaintiffs cannot establish that they suffered an adverse employment action.

Further, as Plaintiffs acknowledge, the terms and conditions of their employment were determined by the Collective Bargaining Agreement between their Union and the College. Hence the College was only able to eliminate the PRWL benefit after reaching agreement on that issue with the Union of which Plaintiffs were members. Thus, it is also undisputed that the "employment action" at issue was not the result of a unilateral decision by the Plaintiffs' employer.[7] (Defs.' Ex. "F," 48; Ex. "G," 67-69, 82; Ex. "H," 75-78; Ex. "I," 51-60; Ex. "K," 117-122; Ex. "L," 41-42). As Plaintiffs Stein and Stern testified: the Union was in agreement with the College concerning the elimination of the PRWL option and the **Union** discriminated against them because it never should have agreed to the contract. (Defs.' Ex. "G," 82-85; Ex. "L," 102-104). For this reason, as well, the required showing of an adverse employment action has not been made.

---

[7] Notwithstanding that none of the Plaintiffs voted in favor of ratification of the 2019 CBA in which the PRWL benefit option was eliminated, the majority of the Federation's membership nevertheless did vote to ratify the contract in April of 2019. (Defs.' Ex. "L," 96, 99-102

11

Nor is there evidence that the Plaintiffs were replaced by employees sufficiently younger to permit an inference of age discrimination. As the College's President, Dr. Donald Generals, James Spiewak, its now-retired Associate Vice President for Budgets and Business Services, and Dr. Judith Gay, the now-retired Vice President for Academic Affairs all testified and as the Plaintiffs were aware, the College must retain a certain ratio of full-time faculty per its student population to satisfy the requirement that 2/3 of its credit hours[8] be taught by full-time faculty. Therefore, for every two faculty members who opted to work a pre-retirement workload, the College had to hire a full-time faculty member. This was because even though PRWL faculty were classified as full-time professors, they were not actually teaching full-time. (Pls.' Ex. "4," 8, 41-42; Ex. "5," 11, 74-76; Ex. "6," 31-34; Defs.' Ex. "L," 77-78). The new hires, however, were not necessarily younger. (Pls.' Ex. "5," 78-79; Ex. "6," 29-30, 277-279). And there is no indicia as to how many or which full-time faculty members were hired to bring the College's ratio requirement into compliance, what courses they were charged with teaching or when they were hired. I therefore cannot find that Plaintiffs have made out the fourth prong of the prima facie test.

Nonetheless, for purposes of providing a complete analysis of Plaintiffs' claims, I conclude that even if a prima facie case could be found, the College has rebutted that showing of discrimination by providing valid, non-discriminatory reasons for its decision to seek the elimination of the PRWL benefit. As Dr. Generals, Dr. Gay, and Mr. Spiewak all testified, the sole reasons behind the PRWL's demise were economic and academic. The PRWL was expensive

---

[8] Estimates varied among these three witnesses as to what the exact full-time faculty to student teaching ratio was. The estimated range was between 62% and 68%, but as Dr. Generals testified, it was always in the approximate vicinity of 2/3 (66%). (Pls.' Ex. "4," 42; Ex. "5," 23; Ex. "6," 33-36).

12

for the College because it necessitated hiring additional visiting lecturers and adjuncts[9], as well as full-time faculty for whom benefits had to be paid to ensure that the 2/3 ratio requirement was satisfied. (Pls.' Ex. "4," 23-24, 40-46; Ex. "5," 23-24; Ex. "6," 31-32). By the College's calculations, it stood to save approximately $1 million per year by eliminating the PRWL program, and while they disputed the $1 million figure, the Plaintiffs themselves freely acknowledged that the program was indeed expensive. (Id., 89-90; Defs.' Statement, ¶ 42; Defs.' Ex. "L," 53-54, 63). Although Plaintiffs questioned the College's financial claims as lacking evidentiary support, they never asked to examine the "expense" evidence either, nor did they produce any contrary evidence to challenge the accuracy of the College's calculations. (Defs.' Ex. "L," 105-111).

In addition to the financial considerations, the College also sought to jettison the PRWL option for what it described as academic reasons. (Pls.' Ex. "4," 41-42; Ex. "5," 21-23). Dr. Generals and Dr. Gay testified that they believed the PRWL had a negative impact on the College's student retention, drop-out, and graduation rates as well as on the levels of its students' success, and that studies established that students are more successful when they are taught and advised by full-time, committed, engaged faculty. (Pls.' Ex. "4," 44-46; Ex. "6," 23-26; Defs.' Ex. "C," 72, 165; Ex. "L," 106). For this reason, the College firmly established that its goal wasn't to eliminate positions or people or replace those faculty who were on PRWL, but rather to eliminate the benefit so as to have its full-time faculty teaching full-time. As Plaintiffs were full-time faculty members,

---

[9] Adjuncts are generally less expensive than a faculty member on PRWL – the average cost for a PRWL faculty member was $39,000 in salary and another $30,000 in benefits to teach four courses per year whereas the average adjunct cost the College between $45,000 and $60,000 to teach those same four courses. (Pls.' Ex. "5," 23-24). But an adjunct is not a full-time faculty member, and thus an adjunct cannot be included in the ratio calculus to satisfy the 2/3 requirement. (Id., 24-26; Defs.' Statement, ¶¶ 46, 47).

13

they could have stayed and returned to full-time teaching; they were not forced to leave. (Pls.' Ex. "6," 28-29, 183).

Plaintiffs have proffered nothing contrary which could create an inference to rebut the College's reasons behind its decision to seek the elimination of PRWL. In their depositions, Plaintiffs were asked about the numerous statements relied upon to establish discriminatory conduct that was set forth in their Amended Complaint. (Pls.' Am. Compl., ¶¶ 50-52,54, 56-57, 60-64). These included:

- The presentation by former Union representative Karen Schermerhorn about wellness plans to reduce the College's healthcare costs during which the then-College President, Stephen Curtis remarked that the College actually "needed" to get older faculty to retire earlier, prompting an uncomfortable laugh from another faculty member who then told Curtis he "should not say things like that."

- The 2010 comment from Vice President of Human Resources Ellen Fernberger, made in an Executive Committee meeting that older faculty members' decision not to retire interfered with her mission was to make the faculty more representative of the City's demographics, and Fernberger's earlier comment made sometime in 2007-2008 during negotiations for an earlier CBA that older people got sick more and cost more for health insurance.

- In the course of a meeting which took place in May 2019 with Margaret Stephens and Michael Stern concerning the elimination of the PRWL option, President Generals was defensive, and contentious to one of the faculty members having to be a full-time caregiver and stated the older faculty were just "hanging on and should retire."

- In an article in the *Philadelphia Sun* newspaper, President Generals was said to have stated that the college would offer benefits to "those seeking to retire at a more normal retirement age of 66."

- In 2019, faculty member Keisha Watson wrote on a listserv that "people on half-time are regarded as boomers hoarding benefits."

- In 2017, faculty member Marc Meola reposted an article on Facebook which claimed all baby boomers were sociopaths.

- On an unidentified occasion, a younger faculty member, Dr. Berg, entered a staff meeting with a decayed wood log in his arms announcing it was a gift to the older faculty.

- That younger faculty members referred to older faculty members as "farts."

14

- Faculty member Junior Brainard's reference during a 2017 Executive Committee meeting that older Executive Committee members were "old people with nothing better to do on Tuesday afternoons but go to Executive Committee meetings."

But In response to questioning on this evidence, most of the Plaintiffs admitted they had no first-hand knowledge of the circumstances or incidents alleged, but rather only learned of these various incidents from one another or from another source. (Defs.' Ex. "F," 119-153; Ex. "G," 76-81, 120-163; Ex. "H," 200-212; Ex. "I," 90-92, 104-126; Ex. "J," 50-57, 180-197; Ex. "K," 151-156, 199-201; Ex. "L," 158-159, 193-199, 203-210, 241-243). In any event, and as the Plaintiffs acknowledged, neither Dr. Curtis, nor Ellen Fernberger were working at the College when the negotiations for the 2019 CBA were ongoing or when it was ratified, nor were Brainard, Meola, Berg or Watson on the College's or the Union's negotiating teams or in positions of authority at the College during negotiations and ratification either. (Id.) None of the Plaintiffs ever complained about or brought the comments or actions of Brainard, Meola, Berg or Watson to the College Administration for discipline, and none of them know whether or not any disciplinary actions may have been taken against those individuals for these actions and/or remarks. (Id.) Thus, to the extent that these alleged incidents could have been viewed as rebuttal to the non-discriminatory reasons provided by the College, they are not supported by the evidence of record, and the description of Dr. Generals' statements appears to be based on the opinions of Stephens and Stern that they were "ageist." I cannot find they are sufficient to rebut the reasonable, non-discriminatory reasons given by the College for its decision to seek the elimination of the benefit through the collective bargaining process. Summary judgment shall therefore be entered in favor of the College on Plaintiffs' claim for intentional, age-discriminatory treatment.

Plaintiffs also cannot sustain their necessary burden on the issue of discriminatory impact. Again, to succeed in prosecuting a disparate impact claim, a showing must be made that a facially

neutral employment practice has fallen more harshly on one group than another and cannot be justified by business necessity – statistical evidence must be proffered that the policy caused a significant age-based disparity. Stouffer, 85 F.4th at 146. "A reasonable, non-age factor that explains an employer's decision . . . precludes disparate impact liability and the burden is on the employer to demonstrate the factor's reasonableness." Bryan v. Gov't of the Virgin Islands, 916 F.3d 242, 248 (3d Cir. 2019). "Reasonableness does not require that there are no other ways for the employer to achieve its goals, . . . [and] "the burden to demonstrate reasonableness is relatively light." Id. (internal quotation marks and citations omitted).

Here, while the eligibility requirements for PRWL naturally meant that those affected by its revocation would be over the age of 55, election of the reduced workload was entirely voluntary. Although there were some 28 faculty members on PRWL when the 2019 CBA went into effect and the benefit was eliminated, some 40% - 45% of the College's nearly 300 full-time faculty were eligible to participate. (Pls.' Ex. "6," 163-164; Defs.' Ex. "D," 66). Thus, while a facially neutral policy (to return full-time faculty to full-time teaching) has been demonstrated, the requisite statistical showing of a significant age-based disparity has not. And, as discussed above, the College has established that it had reasonable, non-age-based, financial and academic reasons for bargaining the benefit away with the Union. Accordingly, I find that summary judgment is properly also granted in Defendant's favor on the Plaintiffs' claims for discriminatory impact.

**IV.   CONCLUSION**

Plaintiffs have failed to adduce sufficient evidence to sustain their claims that the Defendant Community College of Philadelphia violated the Age Discrimination in Employment and the Pennsylvania Human Relations Act in eliminating the Pre-Retirement Workload Benefit through collective bargaining with the Full-Time Faculty & Staff Federation of Community

College of Philadelphia, American Federation of Teachers, Local 2026, AFL-CIO.  The College's motion for summary judgment shall therefore be granted in its entirety.

An appropriate Order follows.